WILLIAM J. WOODS, APPELLANT, vs. WILLIAM BAILEY, ADMINIS-TRATOR DE BONIS NON OF JOHN BELLAMY, DECEASED, APPELLEE.

R. sold land to W., and took his note for the purchase money—R., the vendor and payee of the note, assigned the note to B., and guaranteed the payment. Afterwards R. sold the same land to another person. B., the assignee of the note, pursued the endorser and guarantor, R., to the State of Alabama, (he having gone there with a number of slaves)—sued him upon his guaranty, obtained judgment, and then took a conveyance of personal property from him, to secure the payment of the judgment obtained upon said endorsement, as well as judgments upon other notes of R., and gave him time of payment. Held—That if B., as against the last purchaser of the land, ever had a lien upon it for the purchase money, he waived and abandoned it by these proceedings. Held, also—That if the vendor transfers the note of the vendee, and guarantees the payment, the person taking such guaranty does not acquire a lien upon the land for the purchase money. In such case, the taking of the guaranty is such an additional security as defeats the tacit lien.

The lien of the vendor on lands for the purchase money is lost in all cases, where any security is taken on the land, or otherwise, for the whole or any part of the money, unless there is an express agreement to the contrary.

This cause was brought up by appeal from a decree of the Circuit Court of Jefferson County, made November 8th, 1849, by the Hon. THOMAS BALTZELL, Judge, sitting in Chancery.

6

The facts of the case are so fully and clearly set out in the opinion of this Court, pronounced by Justice Lancaster, that any other statement is deemed unnecessary.

*Hawkins,* for appellant:

Woods, on the 5th day of November, 1844, purchased of Ransom J. Roberts a tract of land for $2,000, and paid the purchase money, partly in cash, and the balance in good negotiable promissory notes on third persons, without notice, as alleged in his answer, of any valid or subsisting lien on the land in favor of any one.

Bellamy claims to have a lien or equitable mortgage on the land in the hands of Woods, upon the following grounds, to wit:

Roberts (as alleged in the bill) on the 26th day of March, 1840, executed a bond to one William H. Williams for titles to *some* land, not specifying the quantity, quality, locality or other description of the land contracted for—Williams on the same day executed to Roberts, his promissory note for $4,000, with interest at ten per cent. per annum, from 1st of January, 1841, and payable 1st of January, 1845, which note Roberts assigned or guaranteed (as alleged in the bill) to Bellamy.

Bellamy, under this statement of the case, could have had no lien upon the land in the hands of Woods, or any body else, even if he had notice of the transfer of the Williams' note for the purchase money to Bellamy; for the endorsee of a note given for the purchase money of land is not, from the mere transfer of the note, entitled to the benefit of the assignor's or vendor's lien on the land for the purchase money. See White vs. Williams and others, 1st Paige's Chancery Reports, page 502. 3 Paige's Chancery Reports, p. 122.

But even admitting that Bellamy had the lien he contends for, Woods, claiming to be a *bona fide* purchaser of the land from Roberts, (who still held the legal title,) for a valuable consideration, without notice (as alleged in his answer) of any valid or subsisting lien on the land in favor of Bellamy, or any one else, acquired a perfect title thereto, both in law and equity, and ought to be protected therein by the Court. See Sugden on Vendors, page 546–7.

Woods admits in his answer that he had heard, but from rumor only, that there had been a contract between Roberts and Williams for the sale of land, but that the contract had been abandoned on the

part of Roberts, in consequence of the failure of Williams to comply with his part of the contract. But the answer does not admit notice of the assignment of the Williams' note, nor is there any notice to Woods of this fact even alleged in the bill, or proof thereof in the cause. But even admitting that Woods had notice of the contract or bond, as set forth in the bill, it could not be contended, by any pretence whatever, that it could have been any notice of the assignment of the Williams' note to Bellamy by Roberts. But there is no proof whatever in this cause, as against Woods, (the bill being taken *pro confesso*, as against Roberts only,) that the bond for title from Roberts to Williams, as set up in the bill, was ever executed by Roberts. The bond, as set forth, bears date 26th March, 1840, and was recorded June 19th, 1844, upwards of four years after its alleged execution, at the *bare request* of J. D. Westcott, Jr., without any proof of its execution whatever ; and the bond set forth appears upon its face to be a mere copy from *this record*, made, as it would seem, for the *express purposes* of this cause, the original bond, if any, not having been produced or filed in this cause, and no excuse alleged or shown for its absence or omission. This, to say the least of it, must be considered by the Court to be a very suspicious circumstance in this cause. But even admitting that the bond had been duly recorded and proved without delay, it would not have been notice to any body—for there is no law requiring such bonds to be recorded, and consequently making them constructive notice ; and even admitting that there was such law requiring bonds of this character to be recorded, the record could not be notice of any thing that was not specified in the bond itself. Consequently, in this case, there being no particular land described in the bond, either by metes and bounds, or number of acres, location or quality of the land agreed to be sold by Roberts to Williams, it could not be considered as notice to *any body of any thing* ; but said bond, even if properly produced and proved in this cause, would have been considered as void for want of certainty, and could not be specifically enforced, either in favor of Williams or Bellamy. 1st Maddock's Chancery, pages 426–7.

Again : Even admitting, for the sake of argument, all the facts set up by Bellamy, as entitling him to a lien on the *land itself*, unless the title thereto had been actually conveyed to Williams, he could have no lien on the land in his hands—for Williams would have no

land on which any such lien could attach, and the mere assignment to Bellamy by Roberts of Williams' note for the purchase money, could not have created a lien on the land in the hands of Roberts, who still held the legal title, as there was no contract between Roberts and Bellamy about land. If Bellamy had any lien whatever, it must have been *through the equity* of Williams—a lien, not upon the *land itself*, but merely a lien upon the *equitable right* of Williams to call for a *specific performance* of the contract, upon payment of the entire purchase money—Roberts having retained the legal title to the land, until the purchase money should be paid ; and *the only way in which* Bellamy could have enforced such lien, would have been to file a bill against Roberts and Williams for a specific performance of the contract between them, in order that the payment of the note might be enforced against the land in the hands of Williams, after the performance of the contract between Roberts and Williams ; but the Court could not have decreed a conveyance of the land from Roberts, until the entire purchase money had been paid, with interest. If Williams would not or could not pay it, Bellamy, if he desired it, might have been subrogated to the *rights* and *equities* of Williams under his *contract ;* but upon the conditions thereto attached—that is, upon the performance by Bellamy of the contract on the part of Williams, to wit : the payment of the $4,000 00, with interest, by Bellamy— Roberts would have been compelled to convey the land to him ; but under no circumstances whatever, could Roberts, under his contract, have been compelled to part with his land, until the entire purchase money and interest had been paid, either by Bellamy or Williams ; and if Bellamy took the land under the equity of Williams, he must have paid the same price for it that Williams had contracted to pay.

It is further alleged in the bill, after the assignment to Bellamy of the note on Williams, that Roberts ran off with some seventeen slaves, and some other articles of personal property, and was pursued by Bellamy into the State of Alabama, and the slaves and other property attached by Bellamy, to satisfy the liability of Roberts, as endorser on the Williams' note, and also three other notes, upon which Roberts was responsible to Bellamy, either as principal or endorser ; that on the 22d of October, 1842, Roberts consented to judgments on all the notes sued on in Alabama, including the Williams' note, which judgments amounted in all to near $10,000 00, and on

the same day, Roberts executed to Bellamy an absolute bill of sale for the seventeen slaves, in payment and ·full discharge of all the judgments so confessed by Roberts ; and on the same day, Bellamy executed a deed or obligation to Roberts, in which he obliges himself to allow Roberts five years to redeem the slaves ; and the hires of the slaves in the meantime to be applied to the payment of Bellamy's demand against Roberts. Bellamy also obliges himself to take the land contracted for by Williams, in full discharge of the liability of Roberts, as endorser of the Williams' note, to assist him in redeeming the slaves—upon condition that Roberts would discharge the incumbrance of the Union Bank on the land within ninety days from the date of Bellamy's deed.

From these subsequent transactions and statement of the case, it clearly appears, from Bellamy's own showing, that the bill of sale for the slaves was given by Roberts, and accepted by him, in full payment and discharge of all the judgments, debts and obligations due from Roberts to Bellamy, including his liability on the Williams' note ; and that the deed or defeasance executed by Bellamy, and signed by him alone, was a mere privilege extended to Roberts, which Roberts could comply with or not at his option, and not at all binding upon Roberts, not being signed by him ; and if Roberts failed to comply with the stipulations in the deed, the only consequence was, that Bellamy took the absolute property in the negroes, and the debts and obligations of Roberts would thereby have been paid and discharged, and Roberts would have kept his land.

And on the other hand, if we consider the bill of sale from Roberts and the deed of defeasance from Bellamy, as to be taken together and constituting a mortgage, it can only be considered a mortgage on the slaves, and not on the land, as there is no land mentioned in the bill of sale from Roberts, the land being mentioned only in the deed of defeasance executed by Bellamy alone, and consequently not binding on Roberts. Then, under this view of the case, considering these transactions as constituting a mortgage in favor of Bellamy on the slaves, as insisted on in the bill, Bellamy must be considered as having waived his lien, if he had any on the land—on the well settled principle, that the taking of independent or other security for the payment of the purchase money of real estate, is considered as a waiver of the implied lien of the vendor. See Fish vs. Howland and others, 1st

Paige's Chancery Reports, page 20 ; also Kent's Com., pages 151 to 153. Bradford vs. Marvin, Florida Reports 1849, page 463.

Bellamy could have been considered only as standing in the shoes of Roberts, in relation to the land, and any transaction that would have discharged the lien of Roberts, while he was the holder of the note on Williams, would equally have discharged Bellamy's lien, if he had any, after the assignment of the note to him.    Consequently, taking the bill of sale or mortgage by Bellamy, to secure the payment of the Williams' note, after it was assigned to him, must be considered as taking other and independent security for the purchase money by Bellamy, and a waiver of his lien, if he had any—the same as if Roberts had taken it from a third person in the first instance.

But, again : The bare consolidation of said note with other debts and notes, and taking a joint security or mortgage for the whole debt— or even the consolidation of the debt claimed in the bill to be a lien on the land, with other debts which were not a lien on it, even without any security—must be considered as a waiver of the lien—for all the debts became but one debt, and every portion of that debt must be of the same nature, and the entire debt, after consolidation, must have a lien on the land, or no portion of it can.    Now, it would be absurd to contend for the first part of this proposition—that the holder of several independent claims, and having a lien for one of them only, could acquire a lien for all of them, by consolidating them.

But even if we consider the deed of defeasance from Bellamy to Roberts, as obligatory upon Roberts—then, it is clearly established, by the evidence of Woods and the proof in the cause, that Roberts did every thing in his power on his part to comply with the stipulations in the deed in relation to the land, and did substantially perform the same ; that he did discharge the incumbrance of the Union Bank within the ninety days specified in the deed, to wit : on the 17th day of February, 1843, thereby showing a readiness, ability and eagerness to perform the stipulations of the deed on his part ; and in a short time after the expiration of the ninety days, Roberts made a formal tender of a deed to the land to Bellamy, in the presence of witnesses, to wit : on the 25th day of May, 1843—which Bellamy refused to accept, and stated as his only reason for refusing it, that *"the land was not worth the money"* he had contracted to allow

Roberts for it, and no objection was made on account of the deed not having been tendered within the time specified; thus clearly showing that he, Bellamy, did not consider that time was of the essence of the contract with Roberts—all of which clearly appears from the bill, answer and proof in the cause; and it is not proved, or even alleged in the bill, that Bellamy had ever requested Roberts to convey the land to him, but seemed to repose with content upon the bill of sale obtained from Roberts for his slaves, as a sufficient security or payment for all his demands against him. Therefore, if Bellamy seeks to enforce his demand against the land, on account of this agreement, he must take the land at the price he agreed in his deed to take it at, (in the event that the Court is of opinion that Bellamy's refusal to accept the deed was not an abandonment of his contract, which we insist upon)—that is, the Williams' note for $4,000 00 with interest; and permit Woods to go upon the other funds in the hands of Bellamy, to the amount thus over-paid by the land upon Bellamy's debt, after a readjustment of his accounts, to indemnify Woods for the loss of the land. But Bellamy can take no advantage of the failure of Roberts to tender him a deed for the land on the precise day agreed upon, as he has not shown that he has been injured thereby, and time, consequently, not considered as of the essence of the contract. See 2 Story's Com. Equity, pages 85 to 88.

It also appears, from the allegations in the bill, that the Williams' note, assigned by Roberts to Bellamy, was not due at the time Bellamy filed his bill. The bill was filed 15th November, 1844, and the note not due until 1st of January, 1845—consequently, if Bellamy had any lien on the land for the payment of the note, he could not have enforced it, or have commenced any proceeding for its enforcement, either against Roberts or Williams, or any body else, until the note had become due, and was duly presented to Williams for payment, and refused by him, and notice of such refusal to pay given to Roberts. And even the confession by Roberts of the alleged judgments in Alabama, on his endorsement of the note on Williams, and afterwards executing a bill of sale for the slaves, to pay or secure the payment of his liability as endorser, could only have entitled Bellamy to have proceeded against the slaves in the bill of sale, or other property of Roberts, for payment of his debt, and not to have

enforced any lien he might have had upon the land until the note became due. There is no allegation in the bill, or proof in the cause, that Bellamy ever demanded payment of the note from Williams—in fact, he could not legally have done so, until the note became due ; and if he has not done so yet, he has lost his recourse upon Roberts.

But again, in conclusion : The bill of complaint having been taken *pro confesso*, as against Roberts only, (who it appears has left this State,) the *bare allegations* in the bill, so admitted by the default of Roberts, ought not to be binding on Woods, or prejudicial to him ; and there is not a shadow of proof in this cause, except the *bare allegations* in the bill itself, that there ever was any contract whatever between Roberts and Williams for the sale of land, or any note given by Williams to Roberts, and assigned by Roberts to Bellamy, or any judgments obtained in Alabama, or in fact of any other allegation in the bill. Wherefore, upon this as well as the other grounds above relied upon, the decree of the Court below ought to be reversed, and the bill dismissed with costs, as against Woods, for want of equity ; or if the Court is of opinion that Bellamy has any lien on the land, either under the original contract *attempted* to be set up between Roberts and Williams, or under the deed of defeasance from Bellamy to Roberts ; then the decree of the Court below ought to be reversed, and the accounts re-adjusted, and Bellamy compelled to take the land, if at all, at the price Williams was to give for it, or at the price Bellamy agreed to take them at—which both amount to the same, to wit : $4,000 00, with ten per cent. interest from 1st of January, 1841 ; and the surplus, after the payment of Bellamy's debt, upon a re-adjustment of the account, to be decreed to Woods ; or Woods permitted to go upon the funds already in the hands of Bellamy, for the amount over-paid by the land.

*Papy,* for Appellee.

The object in making Woods a party to this suit is to subject 600 acres of land purchased by him of R. J. Roberts, one of the defendants, to the payment of a debt due from Roberts to complainant.

This land was sold by Roberts to William H. Williams, in 1840, and he agreed to make out a good title to Williams, who was to pay Roberts $4000, and executed his promissory note for that sum. This note was endorsed by Roberts to Bellamy, and was guarantied by

Roberts. The consideration for this endorsement was cotton sold by Bellamy to Roberts. In 1842, Roberts absconded with all his property, and being pursued by Bellamy, was overtaken in Alabama, where, among other things, an agreement was made, by which Bellamy was to release Roberts from the Williams note, provided Roberts procured a release of the land from the Union Bank incumbrance, and conveyed it to Bellamy within ninety days from the date of the agreement, which was dated the 22d Oct., 1842. Roberts did procure a release but not till after the ninety days had elapsed, and did not tender a conveyance until the fifth day of June, 1843, long after the time limited for him to do so. Bellamy refused to accept it. On the fifth day of November, 1844, Roberts conveyed the land to defendant Woods, who acknowledges to have had knowledge of the agreements set out in the bill, but seeks to establish that they were rescinded.

The question, therefore, arises, is this land subject to the debt due Bellamy's estate on the Williams note? and this will depend upon whether the contract was binding between the parties—whether it was rescinded or not, and whether Woods had sufficient notice to charge him.

I. As to whether the contract was binding.

It is believed that no doubt can exist as to the binding force of this contract. Roberts agreed on one side to make a good title, and Williams, on the other, gave his note, which Roberts transferred to Bellamy. Indeed no objection was taken to this point in the Court below, and it is believed that none will be made here.

If the contract was binding, the thing to be done is considered as done, and the property converted in contemplation of Equity. Lacon vs. Mertins, 3 Atkins, 1. Attorney General vs. Day, 1 Ves., 218.

The estate under such contracts of purchase as in this case, is in the vendee in contemplation of equity, and cannot be revoked by subsequent conveyance of the legal title by the vendor. 7 Vesey, 274. 11 Vesey, 554. 3 John. Ch., 316. Livingston vs. Newkirk.

If Williams were here claiming to subject this land to sale for his benefit, his note having been assigned by the payee, admitting that the land was still in the possession of Roberts, a Court of Equity would decree that Williams had a lien upon the land upon the principle that where there is a payment of the money, or what is, as we

7

contend, the same thing, the delivery of negotiable notes, and an as-
signment of the same *in toto* to a *bona fide* holder, the vendor is a
trustee for the purchaser, so as to oust judgments against the vendor
intervening between the contract and conveyance.

A vendee who has paid the purchase money prematurely, has a
lien against the vendor analagous to that of the vendor in the oppo-
site case.   4 Mad., 503.   15 Vesey, 346.   Lacon vs. Mertins, 3
Atkins, 1.   Farmer vs. Samuel, 4 Litt., 190.   Newman vs. Machin,
5 Haywr., 241.   Frink vs. McKcoun, 4 J. J. Marsh., 169.   Bibb
vs. Prather, 1 Bibb, 316.   Finch vs. Earl of Winchelsea, 1 Pr. Wms.,
278.

Although Williams had not, in fact, paid the purchase money, yet
his note was assigned to a *bona fide* holder, and he was bound on it.
He could not in the hands of Bellamy, make the same defence to it
that he could in the hands of Roberts, unless received after it was
due.   There is, consequently, the soundest reason for holding that the
transfer of the note to a *bona fide* holder, shall be considered as equiv-
alent to the payment of the money so far as to fix the lien of the ven-
dee prior and superior to a judgment between the contract and con-
veyance.   And if this be so, *a fortiori*, a purchaser with notice should
be ousted, since he does not occupy grounds as favorable as those
upon which a creditor stands.   It is believed to be a well settled
principle that he who takes a conveyance of the legal title with no-
tice of an outstanding equity, is in no better situation than his grantor
was.   McNitt vs. Logan, Littel's Selected Cases, 69.   Mason vs.
Sudam, 2 John. Ch., 181.   Wadsworth vs. Wendall, 5 John. Ch.,
229.   Yoder vs. Smrope, 3 Bibb, 204.   Simms vs. Richardson, 2
Litt., 276.   Champion vs. Brown, 6 John Ch., 402.

Roberts having transferred the note given by Williams, stands in
the position of a party who has been paid the purchase money, and
Williams could come into a Court of Equity and establish his lien
upon the land, notwithstanding its conveyance to Woods, who is a
purchaser with notice, as will hereafter be shown.   If Williams
could do this, why may not Bellamy or his representative, who is the
holder of the land note, be entitled to the same rights, and have the
same equities enforced that Williams himself could ?   Instead of go-
ing immediately upon Williams, and Williams going upon the land,
Bellamy or his representative, may reach the land through the equi-

ties of Williams.   Riddle vs. Mandeville, 5 Cranch, 330.   Russel vs. Clark's Ex'rs., 7 Cranch, 69–97.

Roberts must be considered as a trustee for the purchaser, and Woods who took a conveyance with notice, stands in precisely the same condition, he not acquiring any greater or other rights than Roberts himself had.   See cases above cited, Littel's Selected Cases, 69, &c.

II.  The contract was not rescinded and could not have been rescinded unless both parties had agreed to it.

It is claimed in the answer of Woods, that Williams did not complete the contract—that he did not pay the money, and therefore Roberts had a right to consider the contract as rescinded.   This could be done in the case between original parties where the rescision of the contract would leave them *in statu quo.*

No Court of Equity even would, upon the application of either party, rescind a contract where the parties could not be placed in their original position.   Johnston's Heirs vs. Mitchell, 1 A. K. Marsh, 227.   Turner vs. Clay, 3 Bibb, 53.   Skinner vs. Dayton, 2 John. Ch., 533.   Smith vs. Field, 5 Term. R., 403.

Now the parties here could not be placed in their original position. Williams' note was in the hands of an innocent holder, upon which he was bound.   Roberts had received the amount of the purchase money, and if he desired to rescind the contract, he should have tendered this sum to Williams, or procured his note to be cancelled.   It is not pretended that this was done or offered to be done.

III.   Woods was a purchaser with notice.

He admits in his answer that he had knowledge of the contract with Williams, and of the subsequent agreement with Bellamy. He, however, insists that the contract was rescinded, &c.

The knowledge of the facts admitted by him was sufficient to charge him with notice.   It was not necessary that he should have been fully acquainted with all the facts and circumstances.   Whatever is sufficient to put a party on inquiry, is in equity held to be good notice to bind him.   1 Story Eq., S. 400.   4 Kent. Com., 179. 1 John. Ch., 261.   Starry vs. Arden.

The admissions in the answer of Woods shew that there was sufficient to put him on inquiry, and therefore, under the law, he is charged with notice, and he took the conveyance incumbered with all pre-existing equities.

There is, however, another and a very important aspect in which this case is to be viewed.

Bellamy, when he took the Williams note, relied not only upon the responsibility of Williams, the maker, and Roberts, the endorser, but also upon the security which the land to be conveyed afforded. Roberts then may be regarded as a vendor to Bellamy, and one too, who had been paid the purchase money, for he had in point of fact received the purchase money from Bellamy. And if so, under the principles already cited, he was but a trustee to hold the legal title for Bellamy, and could not transfer it to any one. Woods, who took the conveyance with notice of the facts, got nothing beyond the interest of Roberts in the land.

That Roberts himself looked upon the land as bound for the amount of the purchase money note, or that he regarded himself as a mere trustee, is obvious from the compromise agreement between himself and Bellamy, by which he agreed to release the land from the Bank and convey it to Bellamy within ninety days from its date.

It is, however, contended that this is a substantive agreement for a sale, and it having been proved that Roberts did procure a release and executed and tendered a conveyance to Bellamy, which was refused to be accepted, the contract should be considered as rescinded, and Roberts had a right so to consider it.

But it will be seen from the proofs that the release from the Bank was not procured within the time limited by the agreement, and the deed was not tendered—not even executed—until long after the time had elapsed.

This provision of the compromise agreement was gratuitous on the part of Bellamy, and was intended for the benefit of Roberts, who was to be finally released from all claim against him on the land note, provided he complied with the conditions attached. He failed in this respect, and Bellamy was consequently not in anywise bound to accept the conveyance which was tendered.

But it may be said that upon Bellamy's refusal to accept the deed, he virtually rescinded the contract, and Roberts had a right to convey to another. It is granted that the agreement of compromise was rescinded so far as this provision is concerned, but in that event, on what ground do the parties respectively stand? Why, they revert to their original position—they fall back upon their original rights, and

it is shown that Roberts, who had received the purchase money, was but a trustee for the purchaser. How could the rescision of the compromise agreement have the effect of enabling Roberts to convey to another? Were the parties left *in statu quo?* By no means. Roberts had received the purchase money and Bellamy and Williams had got nothing.

*Woodward,* on the same side.

### PROPOSITIONS FOR APPELEE.

I. The agreement between Roberts and Bellamy created *a trust,* which equity will preserve, either in a suit for *specific performance,* or for compensation in damages by vendee.

II. Equity will uphold a *lien* arising from an agreement in relation to land, maintaining between all parties the rights thereby acquired, and enforcing the obligations incurred.

III. Upon failure of vendor to perform an agreement in relation to land, equity will hold the land subject to the *reimbursement* of vendee, for the purchase price which he may have paid.

IV. Equity affords no indemnity or protection to a subsequent purchaser, *with notice.*

V. If an agreement in relation to land be *rescinded,* the purchase price having been prematurely paid, equity will, nevertheless, *subject the land,* in satisfaction to the superior prior lien of the *first vendee.*

As to *parties in chancery.*

All persons in *interest* must be parties to the suit, especially when their rights and interests are therein particularly complicated and involved, or their position an obstacle to its progress, and in conflict with a complainant's asserted claims.

Woods was a *subsequent purchaser* from Roberts, and in *possession of the land in controversy,* when the bill was filed ; he is, therefore, a proper party.

### AUTHORITIES.

*Specific performance.*—2 Story's Eq. Jurisprudence, p. 96. Sec. 772, p. 105. Sec. 779, p. 113. Sec. 788–'89–'90. p. 131, Sec. 796. p. 135, Sec. 798.

*Trusts and Liens.*—P. 606, sec. 1195–'96. p. 638, sec. 1213 to '22. p. 657, sec. 1230 and 31. p. 690, sec. 1254–'57.

*Agreement.*—1 Eq. Dig., p. 78, sec. 13.

*Vendor and vendee.*—2 Eq. Dig. p. 201, sec. 6, 8 and 10. p. 515, sec. 1. p. 517, sec. 19. p. 521, sec. 59.   4 Eq. Dig. p. 693, sec. 10, 11, and 13. p. 694, sec. 25. p. 697, sec. 8. p. 698, sec. 17.

*Reports.*—5 Munf. 507.   Littell's Select Cases, 407.   1 Bibb 313–'15–'16 and 438.   3 J. J. Mar., 40–42.   4 J. J. Mar. 16–'69. 1 Monro, 43–44.

*Brockenbrough*, for appellant, replied at length to the argument of counsel for appellee.

LANCASTER, J.

On the 15th day of November, 1844, John Bellamy, the intestate of complainant, filed his bill of complaint in the then Superior Court for Jefferson County, alleging the indebtedness to him of the defendant, Ransom J. Roberts, for large sums of money, on four several notes, as in his said bill is mentioned, amounting together to about $9,717 54.   One of which said notes, he describes thus : " On a note dated Aucilla, 26th March, 1840, for $4,000, payable on the 1st of January, 1845, with interest at ten per cent. per annum from 1st of January, 1841, to the order of said Roberts, made by one W. H. Williams, as expressed in said note, for value received in land," and endorsed on the 26th day of March, 1840, by said Roberts to said Bellamy, for value received, as expressed in said endorsement, and the payment of which Roberts guarantied to said Bellamy, and was responsible for and assigned said note as a security for cotton sold by Bellamy to him, said Roberts, and for which amount he was bound to Bellamy.   The bill alleges that the defendant, Ransom J. Roberts, made a fraudulent disposition of his property on the 14th day of September, 1840, by making a fraudulent bill of sale of seventeen negroes in the bill named, to his brother, Elijah Roberts, who, on the same day, gave to David Emanuel, a brother-in-law of said Ransom, a power of attorney to take charge of said negroes, and defend them against any other claimant ; and that a few days thereafter, the said Ransom J. Roberts and the said Emanuel absconded secretly from Jefferson County, and from the Territory of Florida, taking with them all said negroes and other property mentioned in the bill.   And the bill charges that all these fraudulent actings and

doings were done with the fraudulent intent and purpose of defrauding the said Bellamy.

The bill further charges that the complainant gave chase after the said Roberts and the said Emanuel, and overtook them in the State of Alabama, where he caused said slaves and other property to be levied upon, arrested, attached and seized by the proper officer, as the property of said Ransom J. Roberts, and as liable for and bound for said debts ; that a claim was interposed by said Emanuel, for and on behalf of Elijah Roberts, which was tried and found by a jury in favor of said Bellamy ; that, thereafter, on the 2d day of October, 1842, an agreement of compromise was entered into by said Bellamy, and the said Ransom J. Roberts and Elijah Roberts, (the latter acting by his agent and attorney in fact,) by which the said Roberts acquiesced in the claim, as established in favor of said Bellamy, and also agreed that judgment should be rendered in favor of said Bellamy, in the suit he had instituted against Ransom J. Roberts, without defence, for the amount of the four several notes sued on, with legal taxed costs, together with other matters therein stated as agreed to, and which may be referred to hereafter.

The bill then says, the foregoing agreement was on the same 22d of October, 1842, " annulled and abrogated, and a conveyance of said slaves and other property was made, executed and delivered by said Ransom and said Elijah, (by his agent and attorney aforesaid,) in the words and figures following, viz :-

" The State of Alabama, ⎱ Ss..
County of Covington, ⎰

" This indenture made this twenty-second day of October, in the year of our Lord one thousand eight hundred and forty-two, between Ransom J. Roberts and Elijah Roberts, (said Elijah by David Emanuel, his agent and attorney in fact,) of the first part, and John Bellamy, of Jefferson County, Territory of Florida, of the second part, witnesseth : that the said Ransom and Elijah, for and in consideration of the sum of ten thousand dollars to them in hand paid by the said John, at and before the ensealing and delivery hereof, and the receipt whereof is hereby acknowledged, and the said Ransom and Elijah therewith fully satisfied, content and paid, and also for and in consideration of divers other matters and things relating to the past transactions and

business of and between said parties, have granted, bargained, sold, assigned, aliened, transferred, released, conveyed and confirmed, and by these presents do grant, bargain, sell, assign, alien, transfer, release, convey and confirm unto the said John, all the following de-scribed slaves and property, now in said County of Covington, State of Alabama, namely, seventeen slaves: Watkins, aged about 28 years; Amos, aged about 20 years; Doctor, aged about 17 years; Celia, aged about 30 years, (sometimes called Seany;) Rose, aged about 25 years; Eliza, aged about 14 years; Toby, aged about 12 years; Tony, aged about 8 years; Phœbe, aged about 6 years; Nancy, aged about 4 years; Crecy, aged about 2 years; Winny, aged about 1 year; Lucinda, aged about 8 years; Little Cely, aged about 4 years; Stephen or Stepney, aged 2 years; Betty or Elizabeth, aged about 1 year, and Mary, aged about 1 month, and the future increase of the female slaves; also, one road wagon and four mules—all of which slaves and property, the said Ransom and Elijah have here-with on this day delivered to said John and into his possession, at the County of Covington aforesaid—To have and to hold the said above described slaves and property and the future increase of the said female slaves, to him, the said John, his heirs and assigns forever, in full, perfect, complete and unincumbered title, estate and possession forever. And the said Ransom and Elijah, jointly and severally for themselves, and for their and each and every of their heirs, executors and administrators, do covenant and agree to and with the said John, his heirs, executors, administrators and assigns, that they, the said Ransom and Elijah, and each of them, and their and each and every of their heirs, executors and administrators, the full, perfect, com-plete and unincumbered title, estate and possession and property, of, in and to the said slaves and property, and the future increase of the said female slaves, and each and every part, portion, and parcel there-of, and without let, molestation or hindrance from any person or per-sons whatsoever, and the peaceable and quiet enjoyment of the use and the said possession thereof, unto and by the said John, his heirs, executors, administrators or assigns forever, they and each and every of them will forever warrant and defend, and sustain the claim or claims of any and all persons whatsoever.

" In witness whereof, the said Ransom and Elijah have hereunto set their hands and seals, (said Elijah by said David Emanuel, his

agent and attorney in fact,) on the day and year first above written, at Montezuma, in the County of Covington aforesaid.

"RANSOM J. ROBERTS, [Seal.]

"ELIJAH ROBERTS, by

"DAVID EMANUEL, [Seal.]

"*His Agent and Attorney in Fact.*

"Signed, sealed and delivered in the presence of us—

"James D. Westcott, Jr.,

"James P. Steedly,

"Lemuel S. Harrell."

"The bill further states, that "on the same day a final agreement of compromise in lieu of the above mentioned, was made between said Ransom and said Bellamy, which was signed and sealed by said Bellamy, and delivered by him to said Ransom, as follows, viz:

"State of Alabama, } Ss.
" County of Covington, }

"This indenture made this twenty-second day of October, Anno Domini 1842, between John Bellamy of the County of Jefferson, in the Territory of Florida, of the first part, and Ransom J. Roberts, late of the same place, of the second part, witnesseth: Whereas said John, executor of Abram Bellamy, deceased, hath heretofore instituted three several suits by attachment in Dale County Circuit Court in said State, against said Ransom, *et al.*, as by reference thereto will appear; and whereas said attachments were levied on seventeen slaves, and a road wagon and four mules, as the property of said Ransom, and claimed by Elijah Roberts, (by his agent and attorney in fact, David Emanuel,) and by consent, the claim was tried before the County Court of said County of Covington, and a verdict this day rendered, that the property was subject to said attachment, and a compromise and agreement made in said case, signed and sealed by said Ransom, and said Elijah, (by his agent,) and by said John, as by reference thereto, bearing even date herewith, and a copy whereof is in possession of the said parties to this indenture, will appear; and, whereas, in pursuance of said agreement, said Ransom and said Elijah have this day executed a conveyance of said slaves and other property to said John, which bears even date herewith, and is recorded in the Clerk's office of said County of Covington, and who delivered said

8

slaves and property to the said John; and whereas said Ransom hath also filed his written consent to judgment being entered in each of the said suits, at the next term of the Covington County Circuit Court, said suits being by consent transferred from Dale Court to Covington, in case a Court is held at Covington next week, and if not, the judgments to be entered at the next term of Dale Circuit Court, said judgments being entered with full release of errors, as by reference to the written consent filed in each of said cases will appear, which judgments all amount in the aggregate, besides costs, to about $9,717 54:

" Now, in order to carry out and fulfil the residue of the conditions and terms of said compromise, with such modifications as the parties thereto have since agreed upon, the said John binds himself to said Ransom J. Roberts, to transport and convey said slaves and property forthwith back to Jefferson County, Florida, and to keep the same in said County of Jefferson, according to the terms of said compromise, until otherwise agreed; and said John further binds himself to said Ransom to extend to said Ransom indulgence on said debts for five years from this date, he the said Ransom, paying the interest thereon at eight per cent. per annum, and payable annually, on the 22d of October in each year, to said John, and said slaves and their increase in the meantime remaining in the possession of said John, and as his property, under and by virtue of said conveyance; and said John binds himself, on full payment and satisfaction of said judgment debt, interest and costs at any time within said five years, to sell, or assign, and reconvey to said Ransom, or to such person as he may appoint in writing, such of said slaves and their increase as may be then living; and said John binds himself to hire out said negroes at just and reasonable prices in Jefferson County, or if he uses them himself, to allow just and reasonable prices or hire for them, and which hire is to be annually, as the same hire becomes due, to be faithfully applied and appropriated to the discharge and payment of the interest and principal and costs of said judgments; and said John further agrees to give said Ransom the privilege and preference of hiring and taking said negroes on equal, reasonable terms with others, if said Ransom desires the same, the hire to be so appropriated and applied as aforesaid. And in order to aid in enabling said Ransom to pay said debts, said John further agrees that he will lease or sell to

said Ransom, on fair and reasonable terms, sufficient lands in the County of Jefferson aforesaid, whereon to reside and work the said slaves during said term, if said Ransom so desires; and said John further agrees that, on said Ransom giving a full, perfect and complete title to the six hundred acres of land in Jefferson County, sold by said Ransom to William H. Williams, to release said Ransom from his liability as endorser of said Williams' note, and upon the debt and interest of said judgment entered thereon—the incumbrance, of the Union Bank, and all others, to be however first discharged satisfied and taken off by said Ransom, and said conveyance by said Ransom for said lands to be either to said John, or to said Williams,. in pursuance of said agreement between said Ransom and said Williams, dated March 26th, 1840, or otherwise, as said John may direct, so that said Williams may be compelled to pay said note, and said Ransom to make said conveyance, and discharge all incumbrances on said land, within ninety (90) days from the date hereof. At the expiration of said term of five years from this date, if any portion of said debt and costs are still unpaid, or any of said interest shall not be paid, sufficient of said slaves to pay the same are to be sold by said John at public auction in Monticello, Jefferson County, on thirty days' notice, and the proceeds taken to pay and satisfy the same ; and if, after payment of all said debts, interest and costs, any of said slaves remain unsold, they are forthwith to be reconveyed and redelivered by said John, as hereinbefore stated ; and if after such sale, there should be a portion of said debts, interests and costs remaining unpaid, said Ransom shall be still liable for the deficiency. The said John is to sell the said wagon and mules at fair prices, and credit the proceeds, after deducting reasonable expenses of transporting said slaves and property back to Jefferson County, Florida, on said judgments.

" In witness whereof, the said John Bellamy hath hereunto set his hand and affixed his seal, the day and year first above written, at Montezuma, Alabama.

" JOHN BELLAMY, [Seal.]

" Signed, sealed and delivered in
the presence of us— " James D. Westcott, Jr.,
     " James P. Steedly,
     " Lemuel S. Harrell."

The bill also charges that the note above mentioned, given by William H. Williams to said Ransom, and by him assigned to said Bellamy, was given and made, as expressed on the face thereof, in consideration of certain lands in said County of Jefferson, containing six hundred acres ; that said Ransom did not make any conveyance to said Williams of said lands, but made and delivered a written agreement or contract to said Williams, in the following words, viz : " I hereby agree to dispose of and deliver, on or before the 1st of December next to William H. Williams, Esq., fifty head of cattle, more or less, at five dollars per head, and fifty hogs, more or less, at one dollar each, five hundred bushels of corn, and some fodder of the crop, at market value, the delivery of the latter to be optional with William Williams. I hereby further agree to make out a clear title to the lands, and to hold myself responsible for all claims against it. (Signed,) Ransom J. Roberts, and dated Aucilla River, 26th March, 1840. Witnessed by John Walsh, and recorded the 19th of June, 1844."

The bill further alleges, that the time of ninety days mentioned in the agreement executed by said Bellamy to said Ransom J. Roberts, in which the said Ransom was to execute a conveyance and discharge all incumbrances on the land, was agreed upon and specified as a material and essential condition of said agreement, and to be part of the essence of the contract, because it was believed said Williams would come to Tallahassee about the first of January, 1843, as a member of the Legislative Council, and remain in said Middle District that month, and afford thereby an opportunity to said Bellamy, if the same was done in ninety days, of applying to Williams respecting the business, and inducing him to accept such conveyance and take the lands, and if he refused, of instituting proceedings in equity against him in said District to compel him to do so, and enforce the payment of said note by him, or effect a compromise with him.

The bill further charges, that Bellamy requested said Ransom J. Roberts, after discharging all the incumbrances aforesaid, within the ninety days aforesaid, to make a title to said Williams and deliver it to said Bellamy or his counsel at Tallahassee, to tender it to Williams, and if he would accept it, to deliver the same to him, and thereby make him liable and bound for said note, but that the said

Ransom entirely neglected and refused so to do within said time, or subsequently, and has not yet done the same according to his agreement. The bill further charges, that said agreement of Oct. 22d 1842, and Ransom's agreement with Williams of 26th March, 1840, were duly recorded, and all said premises were public and notorious in Jefferson County, and William J. Woods had due and legal notice thereof. Yet said Woods, on the 6th day of Nov., 1844, in consideration, as it is pretended by said Ransom and said Woods, of $2000 lawful money paid by said Woods to said Ransom for said land, took and received a conveyance of said 600 acres of land from said Roberts, and caused the same to be recorded in Jefferson County. And the bill charges that the deed was taken by Woods with full knowledge of all the premises, and was made and executed for the purpose, and with the intent of defrauding said Bellamy and said Williams, and that the said deed is fraudulent, null and void, and should be set aside and declared null and void, and said Woods and said Ransom compelled to convey the same so as to fulfil the terms of the agreement between the said Ransom and Williams and Ransom and Bellamy.

The bill further charges, that Williams disputes and contests his liability on said note, especially since the conveyance to Woods, thereby destroying the ability of said Roberts to make him a title, and causing a failure of the consideration of said note ; and the bill contends that both Williams and Roberts are bound and liable to said Bellamy to pay the amount of said note, principal and interest, when due ; and notwithstanding said fraudulent conveyance by said Roberts to said Woods, the said Bellamy has a lien, and charge and equitable mortgage upon said lands, prior and superior to, and above and before said fraudulent conveyance. And the bill charges, that said land should be sold to satisfy said note and interest and costs and expenses, and if insufficient, that Williams and Roberts should both be held and bound to Bellamy for the deficiency.

John Bellamy, the complainant, died, and William Bailey, Adm'r *de bonis non* of said Bellamy, deceased, filed his bill of revivor praying to be admitted as complainant, and was made a complainant as the legal representative of said John Bellamy, deceased. And none of the defendants having appeared or answered said bill except William J. Woods, an order for publication was obtained against them,

and satisfactory proof being made to the Court, that a notice to appear and answer had been published against all the defendants except William J. Woods, according to the terms of the order for publication and agreeably to law, it was ordered, adjudged and decreed, that the original bill be taken as confessed against the said Ransom J. Roberts, Elijah Roberts, David Emanuel and Frances Williams, adm'rx of W. H. Williams, deceased, they having failed to appear and answer said original bill or to plead or demur thereto. The defendant William J. Woods answered, and admitted his purchase of the land mentioned in complainant's bill at the day, and for the sum named in the bill, and which was recorded as stated in the bill, but he says he purchased in good faith, for the legal and valuable consideration of $2000, which he actually and in good faith paid to said Roberts, partly in money and partly in good negotiable promissory notes, on good and solvent persons, which he considered equal to money—that at the time of the execution of said deed by said Roberts, before the filing of complainant's bill of complaint, this defendant in good faith, and without any knowledge on his part, of any legal or equitable claim in favor of any other person or persons whatsoever in, to, or upon said land, paid as above stated for the same.

The defendant further states that he had heard from rumor only, that there had been an old contract in regard to the purchase of said lands by Wm. H. Williams, from said Roberts, but upon inquiry, he was informed and believed, and so charges, that at the time of his said purchase, it was null and void to all intents and purposes. That it was a notorious fact that Roberts had tendered Williams a deed, which Williams refused to accept, and Williams being insolvent, Roberts elected to abandon the contract with Williams, and did abandon it.

And further answering, this defendant saith, he had also heard from rumor only, before he purchased from Roberts, of the contract or agreement in complainant's bill mentioned, between said Roberts and complainant in regard to said land, but at the same time he was informed and believed, and so charges, that said agreement was also rescinded, and at the time of the purchase of said land by this defendant, was null and void. That said Roberts had done everything necessary on his part to be done, to complete said contract, and had at great costs and charges, sacrifice and trouble, paid off and discharged all

the incumbrances and liens on said land, and tendered in the pres-- ence of witnesses, a good and sufficient legal title to said land to said complainant Bellamy, clear of all incumbrances and liens, in pursu- ance of the agreement between said Roberts and said Bellamy, and that said Bellamy refused to accept said title so tendered to him, and refused to have any thing further to do with said lands, and disclaimed repeatedly, in the presence of divers good citizens of Jefferson County,. that he had any claim, title, interest, or lien, in, to, or upon said land, and that he never intended to have anything more to do with' it, and said Roberts did then elect to abandon said contract with said Bellamy, as he had a right to do under the circumstances. This defendant denies positively that the deed of said land made by Rob- erts to him, was made and received for the purpose and with the in-- tent, to defraud said Bellamy and said Williams, or any body else,. but avers it was made in good faith, and for the valuable considera- tion aforesaid. And he denies all the charges and imputations con- tained in said bill against him, of combination on the part of this- defendant, with said Roberts or any one else, for the purpose of de-- frauding, injuring, or vexing the said complainant or any one else.- And afterwards a decree was entered by consent of complainant's solicitor and the solicitor of said Woods, and it was ordered, among other things, that said defendant Woods have leave to file his amen- ded answer. And in pursuance of said consent decree, said defen-- dant Woods filed his amended answer, by way of demurrer, in short, relying upon the statute which allows defendants to insist upon any matter of demurrer in their answer, and insisting among other things, that said bill should be dismissed, because the same wants equity apparent upon the face of it, and because the same does not set up any claim, right, title or interest in equity, or any equitable lien to the land of this defendant bought of said Roberts.

And by way of plea under said statute this defendant insists that said Roberts offered to said Bellamy a deed of conveyance in fee simple, a copy of which is filed with his answer, and which deed conveyed a good and valid fee simple, unincumbered title to said Bellamy, which he refused to accept before the purchase of said lands by this defendant.

There are many other matters contained in the original bill of complaint, not herein set down or noticed, but all is contained in the

foregoing statement, which is believed to have relation to the controversy between complainant and the defendant W. J. Woods, who are the only parties litigant before this Court.

It is in proof by two witnesses in this cause, that on the 1st day of June, 1843, they tendered and read to John Bellamy, the original complainant in this suit, a deed of conveyance from Ransom J. Roberts to said Bellamy for a certain tract of land, containing 600 acres —that the said Bellamy refused to accept said deed, saying he would take the land for its worth, and that the land was not worth the money mentioned in the deed, say $4000. It is also in proof that R. J. Roberts filed with the clerk of Jefferson County Court on the 17th February, 1843, for record, a deed of release from the Union Bank to said Roberts, which deed bears date the same day it was received and filed. The cause came on afterwards to be heard, so far as the defendant William J. Woods is concerned, upon the bill, answer and exhibits, and after argument of counsel and time for consideration taken by the Court, " it was ordered and decreed that the said complainant has a lien and charge upon said land mentioned in said bill of complaint, and that the same is in equity prior and superior to, and above and before the conveyance by said Roberts to said Woods, to the extent of the balance due to said complainant from Ransom J. Roberts, on the note given by said Williams to said Ransom, and by him transferred to complainant's intestate, amounting, in the aggregate, with interest, to the present term, to $3,809 77–100.

" And it is further ordered and decreed, that the said conveyance from said Ransom J. Roberts to said William J. Woods for said land, dated the fifth day of November, 1844, mentioned in said bill, though valid between the parties, be, and the same is hereby set aside, as far as claim of complainant is concerned.

" And it is further ordered and decreed, that the land described in said deed, to wit : The southwest quarter of the northeast quarter, the northwest quarter of the southwest quarter, the southwest quarter of the northwest quarter, the southwest quarter of the southwest quarter, the northwest quarter of the northeast quarter, the east half of the northeast quarter, the east half of the northwest quarter, the east half of the southwest quarter, the west half of the southeast quarter, and the east half of the southeast quarter, all in section two, of township two, range five, north and east, in the district of land subject to

sale at Tallahassee, containing about six hundred acres, more or less, be sold by the sheriff of Jefferson County, after giving public notice of the time and place of sale, said notice to be, as in cases of sales under execution at law, the proceeds of which sale to be applied to the amount so ascertained to be due as aforesaid.

" And it is further ordered and decreed, that defendant Woods, pay the costs of the said sale and of this decree, and the depositions and other proceedings connected therewith.

"THOMAS BALTZELL, *Judge.*

" November 8th, 1849."

From which decree the defendant, Woods, appealed to this Court. And here contends that the complainant's intestate, John Bellamy, does not in his bill, set up any claim, right, title or interest in equity or any equitable lien to the land, which he, defendant, bought of Ransom J. Roberts, and that the decree of the Court below is erroneous. The agreement for the conveyance of land by the defendant Ransom J. Roberts to W. H. Williams, whose legal representative is also sought to be made a defendant, expresses no time at which the conveyance was to be made, and the vendee, Williams, had a right to have a title at any time on demand. As Roberts ought, therefore, to have made him the title, equity will consider it as done. 2 Story Eq. Jur., Sec. 792. The agreement for title bears date 26th March, 1840, and on that day Williams executed his note to Roberts, or order, for the sum of $4000, payable on the 1st January, 1846, with interest at ten per cent. per annum from the 1st January, 1841, for value received in land. As no other security but the note of Williams was taken for payment of the purchase money, according to all the authorities except in the case reported in Ambler, page 724, and a few others following its lead, and which have been repeatedly overruled, the vendor's lien attached in favor of Roberts, and that lien in equity is said by Chancellor Wallworth to be admitted to exist everywhere in England and the United States, where there is a Court of Chancery to give effect to such a lien. 1 Paige Ch. R., 24.

On the day of the date of said note it was, as the bill alleges, endorsed, for value received by Roberts, the payee, to John Bellamy, the original complainant in this suit, who the bill alleges, guarantied and held himself responsible for payment thereof to Bellamy, the en-

9

dorsee or assignee ; whereby the said Bellamy claims in his said bill to have a lien, charge, and equitable mortgage upon said lands, prior and superior to the title of Woods, derived through his convey-ance from Roberts.   Whether the vendor's lien under any circum-stances is transferred to the assignee of the vendor, is a question which, though much discussed up to a comparatively late period, ap-pears not to have been settled in England.   See 1 Paige Ch. R., 26–7.   It may be here observed, however, that by the endorsement of the note to Bellamy, and the guarantee alleged in the bill to have been taken by him of Roberts' individual responsibility, to say the least, a disposition on his, Bellamy's part, to rely on the vendor's lien, if in contemplation of equity assigned to him, does not appear very manifest, but it seems to have been his intention to have the personal responsibility both of vendor and vendee, as well as the tacit, equitable lien on the lands, with which to secure himself in the payment of the note—whether he can do this, remains to be seen.

The bill sets up, that afterwards, Roberts, with others, fled and absconded from Florida, with all his negroes and other enumerated property ; that he was pursued by Bellamy, who overtook him in the State of Alabama, and instituted legal proceedings against him, on the note assigned to him by Roberts, as well as other notes ; that proceedings were thereon had, by which he brought Roberts to a compromise on the 22d October, 1842, by which compromise Rob-erts agreed to confess judgment in the State of Alabama, on all the demands which Bellamy had against him, and that judgments were actually rendered in favor of said Bellamy in said State against said Roberts in three several suits—one of which was on his endorsement of the note, in this opinion referred to, and was for the sum of $4,-722 19, with interest thereon at eight per cent. per annum from the 22d October, 1842, till paid, and costs.   And that on the same day, a final agreement or compromise was made between the parties Bellamy and Roberts, by which Roberts conveyed to him seventeen negroes, &c., for and in consideration of ten thousand dollars, ad-mitted to have been received by said Roberts from said Bellamy, which conveyance was signed by the said Roberts, and on the same day Bellamy executed to said Roberts an indenture which re-cognizes that the conveyance of the slaves, &c., as above, was made in consideration of the judgments so by consent to be given to said

Bellamy—one of which is on Roberts' endorsement on the note of Williams to him—and all of which judgments, together, besides costs, amount to the sum of about $9,717 54.    That indenture binds said John Bellamy to extend time for payment to said Roberts, for all said debts for five years from its date, and making further provision for the transportation of the slaves and other property back to Florida, and for the disposition of it by hire, sale, &c., it says, in order to enable said Ransom to pay said debts, said Bellamy agrees that he will lease him lands, &c., and further agrees that on said Roberts giving a full, perfect and complete title to the 600 acres land in Jefferson County, sold by him to Williams, to release said Roberts from his liability as endorser of said Williams' note, and upon the debt and interest of said judgment entered thereon, " incumbrances first to be removed, and the conveyance to be either to Bellamy or to Williams, or otherwise as Bellamy may direct," so that said Williams may be compelled to pay said note ; and said Roberts to make said conveyance, and discharge all incumbrance on said land within ninety days from the date of the indenture.    The indenture further provides, that at the expiration of five years from its date, if any portion of said debt, interest, and costs remains unpaid, negroes shall be sold to pay it ; if any remain unsold, they are to be reconveyed to Roberts, but if all are sold and there remains a portion of said debts, interests, and costs unpaid, the said Ransom J. Roberts shall be still liable for the deficiency.

We think the plain, unequivocal effect and result of these proceedings is, that by taking judgments on these claims in the State of Alabama, and the conveyance of the slaves, &c., thereon, in the nature of a mortgage, (the indenture of Bellamy to Roberts giving to the transaction that effect,) Bellamy thereby plainly indicated his intention to rely on that mortgage as a security for the whole of his debts, &c., and in the event that was insufficient, then to rely on the personal responsibility of Roberts for the residue.    That this was intended, seems inevitable—or else why extend the time of payment on the Williams note, which would be due on the 1st of January, 1845, as in favor of Roberts' endorsement thereon, for the term of almost three years longer ? or why consolidate the judgment obtained on Roberts' endorsement of that note with the judgments obtained on other notes, and take a joint security by mortgage for the whole ?

In order to enable Roberts to pay these debts, it was stipulated, if Roberts would discharge the incumbrances on the lands sold to Williams, and make a good title thereof to Bellamy or Williams, or otherwise as Bellamy might direct, within ninety days from the date, that Bellamy would release him from his endorsement on the Williams note, and from the debt and interest of the judgment entered thereon. It appears by the proofs in this case, that on the 17th of January, 1843, less than ninety days after the 22d October, 1842, Roberts filed in the Union Bank, in substitution for the mortgage which the Bank held on the lands in controversy in this suit, a security which was deemed satisfactory to the Bank, and it thereafter executed a release to him of his mortgage, which was filed for record in the Clerk's office for Jefferson County on the 17th February, 1843, and that thereafter he tendered a deed of said land to said Bellamy on the 1st day of June, 1843, who declined taking it, and refused to accept it, saying he would not give the consideration therein of $4000, but was willing to give what it was worth. No objection was here raised that the incumbrances were not removed, or any defect suggested as to the tenor or execution of the deed, nor yet was any thing said as to the time being too late, but only the price was too much.

Bellamy, in his bill, alleges, that time was of the essence of his contract with Roberts, in regard to this conveyance, because about the 1st of January, 1843, Williams was expected at Tallahassee to attend the Legislative Council, and he could then see him and compel him to take the land, or sue him in Middle Florida if he refused, or compromise with him. It is not alleged, that Williams did come at the expected time, or that Bellamy was injured by the delay ; no damage is stated in the bill, but only it is urged that time was of the essence of the contract. In Story Eq. Jur., Sec. 776, it is laid down as true, that Courts of Equity have regard to time so far as it respects the good faith and diligence of the parties. But if circumstances of a reasonable nature have disabled the party from a strict compliance, or he comes *recenti facto*, to ask for a specific performance, the suit is treated with indulgence and generally with favor by the Court.

We cannot see in this, bad faith on the part of Roberts ; he did, as soon as he reasonably could, all that was necessary, to invest Bellamy with an unincumbered, legal, valid title to these 600 acres of land in

controversy, which title Bellamy refused to accept, and he, Roberts, might, thereupon, with propriety, perhaps, have gone into a Court of Equity, and tendering the conveyance, might have compelled Bellamy to release to him the whole amount of the judgment and interest obtained by Bellamy in the State of Alabama, on and by reason of his, Roberts' endorsement on the Williams note. Or he might, as he appears to have done, have abandoned that contract and obligation of Bellamy to him, in which last event no objection is perceived, so far as Bellamy's interest is concerned, to his selling to any purchaser he might meet.

To return to the consideration of the security by mortgage taken by Bellamy from Roberts in the State of Alabama on the 22d of October, 1842. It seems proper to remark, that the lands are not mortgaged or named or recognized as under lien to Bellamy, nor does the transaction which there took place, in the direct conveyance by Roberts to Bellamy, or in his indenture explanatory of the transaction given to Ransom J. Roberts, state or shew, that the conveyance or mortgage was given by Roberts or received by Bellamy, as an additional or further security for the whole or any part of said judgment debts, but on their face appear to be the entire security taken to secure payment of the whole debt. Whether by the endorsement of vendor, and his guarantee of payment of Williams' note, he gave or transferred to Bellamy the vendor's tacit or equitable lien, comes now to be more particularly considered.

In the case of Francis vs. Hazleriggs, Executor, it was held, where the vendor gave a conveyance and took a bond for the purchase money, in which a third person joined as security, there was no lien upon the land. Hardin's R., 48. And in the case of Bradford, administrator, *et al.* vs. Marvin and Martin, 2 Flor. R., 463, this Court expressly recognize the same doctrine. Authorities to the same effect might be multiplied. Now what, let it be asked, supposing Bellamy invested with the vendor's lien, by virtue of the endorsement of Roberts, is Roberts' guarantee to him, but an agreement of Roberts to become security for the payment of the amount of the note by Williams to Bellamy? Bellamy being supposed then in the position to claim the vendor's lien, as against Williams, takes the additional security of Roberts' responsibility—but this in equity, as we have seen, defeats the tacit lien. In the case of White vs.

Williams, 1 Paige Chancery Reports, 506, Chancellor Wallworth says, " The claim of a complainant for a specific lien on the premises, upon the ground that his judgment was obtained on a note given for a part of the purchase money, cannot be sustained. At the time he bought the note of Kingsbury, the latter had unquestionably such a lien, but it is not pretended that there was any agreement that such lien should be transferred to the complainant." And again : " But I am not aware of any case, where the assignee of the note, or other security, has been permitted to sustain such a claim, on an implied agreement to assign the lien." Again : " I am satisfied that the sale and prosecution of the note to judgment, in the name of the endorsee, must be considered as a waiver of the original implied lien for the purchase money on the land." This authority of high respectability appears much in point, and we might, with great safety, rely on it as precedent conclusive of this case. But we feel inclined to inquire, supposing we are mistaken, and that the vendor's lien may be transferred tacitly to his assignee, whether in this case there has not been a waiver, or abandonment of it. The rule, as laid down in Fish vs. Howland, 1 Paige Ch. R., 30, is " to to sustain the equitable or implied lien, whenever the vendor has taken the mere personal security of the purchaser only, and to consider any bond, note or covenant given by the vendee alone, as intended only to countervail the receipt of the purchase money contained in the deed, or to show the time and manner in which the payment is to be made, unless there is an express agreement between the parties to waive the equitable lien. And on the other hand, to consider the lien as waived, whenever any security is taken on the land or otherwise, for the whole or any part of the purchase money ; unless there is an express agreement that the equitable lien on the land shall be retained, the lien is lost." The Chancellor says : " This constitutes a safe rule, easily understood, and which I consider established by a weight of authority in this country which is not easily shaken." This Court, in the case before referred to, 2 Florida R., 471, say, quoting from 4th Kent's Commentaries, 152–3—" Taking a note, bill or bond, with distinct security, or taking the distinct security by itself, either in the shape of real or personal property from the vendee, or taking the responsibility of a third person, is evidence that the seller did not repose on

the lien, but upon independent security ; and it discharges the lien, and taking deposit of stock discharges the lien."

If, therefore, we were to consider that, by the assignment of Williams' note to Bellamy, he became tacitly invested with the implied lien, which Roberts, the original vendor, had upon the lands sold by him to Williams, the vendee, yet it would be no stronger in his hands, than in the hands of Roberts ; and we have seen that the taking a distinct, separate security discharges the lien.   And there was no express agreement originally to transfer the lien to Bellamy, nor yet any agreement when Bellamy took the separate security, that he should either have or retain any equitable lien on the lands.

Nor will the complainant's case be better, by considering that Roberts held the legal title, to secure the payment of the purchase money ; for if so, then Bellamy, as assignee, to have that lien, ought to have had the title conveyed to himself ; for equity will not force it out of the vendor, (the purchase money being due,) for less than the sum it secured.   But we have seen when that was offered him, he refused it ; and he shows, both by his bill and his statement at the time the deed was tendered him, that he did not consider the lands a sufficient security for the amount of Williams' note ; for he says in the bill $2,000 are as much as they are worth, and at the tender he says that they were not worth $4,000 ; and yet at that time the note, with its interest, was worth near $5,000.   He, Bellamy, has shown by his bill, that he took a distinct, separate, substantive security from Roberts for the amount of the judgment which he had obtained against him in Alabama, on his, Roberts', endorsement of said note, for its full amount, with the interest then due ; and unless there had been (which is not alleged) a distinct agreement he should keep that note as collateral security, the property of it was no longer in him, and Roberts, the endorser, was entitled to the possession, and it ought to have been restored to him.   There is also reason to suppose that Bellamy himself either never thought of, or did not rely on the vendor's lien, until a short period before he filed his bill in this case ; for Roberts' agreement to convey to Williams was never recorded until the 19th day of June, 1844, and then by the request of Bellamy's counsel, and without proof of its execution.

The opinion of the Court is, that the demurrer of the defendant, William J. Woods, to the bill of complaint filed in this cause, is well

taken ; that the bill on its face sets up no right, title, or interest in equity, or an equitable lien to the land in controversy, in favor of the complainant and appellee, and that the judgment and decree rendered therein, as against the defendant, William J. Woods, is erroneous :

It is, therefore, considered, ordered, adjudged and decreed, that the decree of the Circuit Court, rendered on the 8th of November, 1849, and entered of record on the 23d day of November, in the year last aforesaid, be, and the same is hereby, reversed, annulled and set aside, in all things therein contained ; and it is further ordered and decreed, that the said bill, so far as the same relates to the defendant, William J. Woods, be dismissed, and that he go thereof without delay, and that he recover his costs, &c.

*Per curiam.*